UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>    Brian Wolfson,<br>                    Debtor. | Case No.:    23-15941-ABA<br><br>Chapter:    7 |
| 1st COLONIAL COMMUNITY BANK,<br><br>                    Plaintiff,<br>    v.<br><br>BRIAN WOLFSON,<br>                    Defendant. | Adv. No.:    23-01390-ABA<br><br>Judge:    Andrew B. Altenburg, Jr. |

**MEMORANDUM DECISION**

Before the court is the adversary proceeding initiated by the Plaintiff, 1st Colonial Community Bank ("1st Colonial"), against Debtor/Defendant Brian Wolfson ("Wolfson", together with his wife Laurie, the "Wolfsons") through its Complaint (Doc. No. 1) (the "Complaint"), alleging a non-dischargeability of debt pursuant to, *inter alia*, 11 U.S.C. §§ 523(a)(2)(A) and(a)(2)(B) related to a series of loan transactions for the construction of real property located at 110 Munn Lane, Cherry Hill New Jersey (the "Property"). After a two day trial and considering the testimony and documentary evidence, along with post-trial submissions from the parties, the court concludes that Wolfson is not precluded from presenting his defenses to the claims of 1st Colonial and that 1st Colonial has not met its necessary burden as to the necessary element of reliance required under sections 523(a)(2)(A) and(a)(2)(B) and because 1st Colonial must satisfy all elements set forth in those statutes to succeed on its claim, the debt owed by Wolfson to it is dischargeable.

**JURISDICTION AND VENUE**

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334, 157(a), and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012 and June 6, 2025, referring all bankruptcy cases to the bankruptcy court. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). Pursuant to Federal Rule of Bankruptcy Procedure 7052, the court issues the following findings of fact and conclusions of law.

**PROCEDURAL HISTORY**

Wolfson filed his main bankruptcy case under Chapter 11 on July 12, 2023. Case No. 23-15941 (the "Main Case"). On September 5, 2023, the bankruptcy case was converted from Chapter 11 to Chapter 7 and Brian Thomas was appointed as the Chapter 7 Trustee (the "Trustee"). On December 14, 2023, 1st Colonial filed its Complaint. Doc. No. 1. Wolfson filed an answer on April 9, 2024 (the "Answer"). Doc. No. 21. 1st Colonial then moved for summary judgment on Counts I and II (theories under 11 U.S.C. §§ 523(a)(2)(A) and (B)). Doc. No. 23. Wolfson filed opposition. Doc. Nos. 25 and 26. The court denied 1st Colonial's Motion for Summary Judgment. Doc. No. 37. In its oral opinion, the court noted, *inter alia*, that there were genuine disputes of material facts regarding Wolfson's intent and whether 1st Colonial relied on the alleged misrepresentations. *See* Doc. No. 36, Oral Summary Judgment Opinion. The court then conducted a full trial on the allegations in the Complaint and the transcripts of that two-day trial are reflected on the court's docket as Doc. Nos. 49 and 50.[1] The witnesses presented were the Wolfsons, a former employee of 1st Colonial, and a forensic accountant.[2] The parties have submitted their post-trial pleadings, i.e., Trial Brief filed on behalf of 1st Colonial Community Bank, Doc. No. 52 ("1st Colonial Brief") and Post-Trial Brief filed on behalf of Brian Wolfson, Doc. No. 53 ("Wolfson Brief"). Because the court required further clarification of the parties' arguments, 1st Colonial filed two further Responses, Doc. Nos. 54 and 56. Wolfson also filed two further responses, Doc. Nos. 55 and 57. The record is closed and the matter is now ripe for consideration.

**DISCUSSION**

1st Colonial is alleging that the debt owed by Wolfson to it is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B). And while 1st Colonial also originally sought relief under 11 U.S.C. § 523 (a)(4), it has subsequently withdrawn its claim under that section. Doc. No. 54, p. 2.

To begin with, generally, the provisions of section 523(a) are "strictly construed against creditors and liberally construed in favor of debtors," owing to the overriding bankruptcy purpose of granting debtors a fresh start. *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995). *See also In re Pelkowski*, 990 F.2d 737, 744 (3d Cir.1993); *Elliott v. Piazza*, No. 3-22-CV-1808, 2023 WL 7224161, at *2 (M.D. Pa. Nov. 2, 2023), *aff'd as modified sub nom. In re Piazza*, No. 23-3061, 2024 WL 4973301 (3d Cir. Dec. 4, 2024). The creditor opposing discharge therefore has the burden of establishing that an obligation is not dischargeable by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See also In re Sternberg*, No. Civ. A. 09-2514 (FLW), 2010 WL 988550, at *3 (D.N.J. Mar. 12, 2010) ("It is well established that a creditor objecting to the dischargeability of a debt bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to

---

[1] Whenever the term "Trial Tr. 1" is used, it refers to Doc. No. 49, the Trial Transcript from the hearing held on March 19, 2025. Likewise, whenever the term "Trial Tr. 2" is used, it refers to Doc. No. 50, the Trial Transcript from the hearing held on March 27, 2025.

[2] The court did not find the forensic accountant's testimony helpful or compelling as to the necessary element of reliance.

discharge enumerated in 11 U.S.C. § 523(a).") (*citing Grogan,* 498 U.S. at 291). In addition, a creditor must satisfy *each* element listed in the applicable Bankruptcy Code section in order to prevail on their claim. *Grogan*, 498 U.S. at 283-91. *See also In re Spar*, 176 B.R. 321, 326 (Bankr. S.D.N.Y. 1994) (alleging the nondischargeability of a debt under section 523(a) requires the satisfaction of each element); *In re Kosinski*, 424 B.R. 599, 608 (B.A.P. 1st Cir. 2010) (under 11 U.S.C. § 523(a)(2)(B), a creditor must prove all five elements). Therefore, here, 1st Colonial *must prove* by a preponderance of evidence that *each* element of 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B) are satisfied in order to prevail on its claims against Wolfson. If one element is missing, 1st Colonial's claim fails.

### 1. *Res Judicata* effect of State Court Judgment as to 1st Colonial's Non-Dischargeability Claim Against Wolfson

The court must first address the issue of preclusion, as 1st Colonial argues a fraud judgment (the "State Court Judgment") entered in September 2023 against Laurie Wolfson in the Superior Court of New Jersey – Law Division is *res judicata* as to 1st Colonial's nondischargeability claim against Wolfson. The State Court Judgment followed an unopposed motion for summary judgment (the "Summary Judgment Motion"). 1st Colonial Ex. 47 and Doc. No. 55, p. 7. The argument was raised in 1st Colonial's post-trial briefs, 1st Colonial Brief, Doc. Nos. 52 and 56. No evidence or arguments were presented at trial regarding this position.[3]

1st Colonial argues the State Court Judgment is *res judicata* as to its claims against Wolfson, as Laurie was in privity with Wolfson and the elements of legal fraud are analogous to the elements of 11 U.S.C. §§ 523(a)(2)(A) and (B). Doc. No. 52, pp. 54-55.

Wolfson first argues that *collateral estoppel* is the applicable doctrine here as neither party has sought to relitigate the claims settled in State Court but rather disagree about the State Court's findings on particular issues. Doc. No. 55, p. 2, n.1. Wolfson claims collateral estoppel does not preclude his defense because the Summary Judgment Motion was not "actually litigated in the prior proceeding" because it was unopposed, the record is silent as to whether there were actual findings of fraud (and more importantly to this court, reliance), and the Third Circuit disfavors the intent element of fraud to be decided on summary judgment. Doc. No. 55. pp. 3-9.

In 1st Colonial's response, it argues that whether the court applies *collateral estoppel* or *res judicata*, the outcome is the same. Doc. No. 56, p. 3. 1st Colonial notes that the State Court Judgment was entered pursuant to R. 4:46-2, with a statement of material facts that was undisputed. *Id*. 1st Colonial posits that Laurie Wolfson failed to oppose those facts as required by R. 4:46-2(b), and all of its material facts, which were sufficiently supported, were deemed admitted. *Id*. at 4. Laurie Wolfson could have appeared or sought reconsideration of the State Court Judgment but

---

[3] It should be noted that there are facts, proposed or otherwise, and arguments set forth in the parties' post-trial submissions which are derived from exhibits that were not presented directly to or examined by the court or any witness during the trial and for which no foundation or relevance was laid. Nevertheless, the parties have taken the position that in accordance with paragraph 7 of the *Joint Order Scheduling Pretrial Proceedings And Trial* dated March 18, 2024, Doc. No. 16, those exhibits are deemed admitted since there was no timely objection thereto. *See* Trial Tr. 2, pp. 130:6 – 132:7. While the exhibits will be deemed admitted, without more, the court will only give those exhibits the proper weight due.

did not seek such relief. *Id*. Further, 1st Colonial contends the matter was "actually litigated" as Laurie Wolfson's failure to oppose the Summary Judgment Motion came after she and Wolfson had been contesting the matter for years and engaged in discovery. *Id*. at 3.  Additionally, 1st Colonial argues Laurie Wolfson's "strategy of allowing an unopposed Fraud Summary Judgment to be entered against her" came after Laurie Wolfson had every opportunity for notice and to defend. *Id*.

The court views the proper doctrine to apply is collateral estoppel or "issue preclusion" as the same claim is not being brought but rather it is an issue of fact or law pertaining to fraud that is being litigated here. *See Witkowski v. Welch*, 173 F.3d 192, 198-99 (3d Cir. 1999). Without question, the principal of collateral estoppel applies in discharge proceedings in bankruptcy courts. *Grogan,* 498 U.S. at 284–85 n. 11, 111 S.Ct. at 658 n. 11, 112 L.Ed.2d 755; *In re Docteroff,* 133 F.3d 210, 214 (3d Cir.1997); *In re Baals*, No. 21-13750 (JNP), 2023 WL 1856638, at *3 (Bankr. D.N.J. Feb. 8, 2023). "Under 28 U.S.C. § 1738 a federal court must refer to the preclusion law of the state in which the judgment was entered, in this case, New Jersey." *Baals,* 2023 WL 1856638, at *3 (*citing In re Chung-Hwan Kim*, 2018 WL 671467, *34 (Bankr. D.N.J. Jan. 31, 2018)).

Under New Jersey law, collateral estoppel may be used to estop a claim when:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding;
> (2) the issue was actually litigated in the prior proceeding;
> (3) the court in the prior proceeding issued a final judgment on the merits;
> (4) the determination of the issue was essential to the prior judgment; and
> (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*In re Azeglio*, 422 B.R. 490, 494 (Bankr. D.N.J. 2010) (citing *In re Estate of Dawson*, 136 N.J. 1, 20, 641 A.2d 1026, 1034–35 (1994)). "[Collateral estoppel] has its roots in equity, and will not be applied when it is unfair to do so." *Azeglio*, 422 B.R. at 496-97 (quoting *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 522 (2006)). As the *Baals* court noted:

> "[F]ederal and New Jersey state common law regarding the principles and application of collateral estoppel (or issue preclusion) are substantively similar if not identical." *Chung-Hwan Kim*, 2018 WL 671467, at *34. Like federal law, New Jersey courts generally do not apply collateral estoppel in the case of a default judgment because such judgments are not 'actually litigated.' *Azeglio*, 422 B.R. at 494 (citing *In re Hawkins*, 231 B.R. 222, 231 (D.N.J. 1999); Restatement (Second) of Judgments § 27 cmt. e.; *Slowinski v. Valley National Bank*, 264 N.J. Super. 172, 183 (App. Div. 1993)).

> There are two exceptions to this general rule. The first is where the defendant against whom a party seeks to enforce collateral estoppel substantially participated in the preceding litigation, and the second is where the default was entered as a result of that party's bad faith conduct in the preceding litigation. *Azeglio*, 422 B.R. at 495: *see also In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997); *Chung-Hwan*

*Kim*, 2018 WL 671467, at \*33. What is crucial is that the party in the initial action had the opportunity to fully and actively participate in the actual trial. *See id*.

*Baals*, 2023 WL 1856638, at \*4.

The court finds Wolfson's argument more persuasive here. The court, owing to the overriding bankruptcy purpose of granting debtors a fresh start and strictly construing the nondischargeability statutes, views it is best for Wolfson to have a full and fair opportunity to "actually litigate" the factual issues before a trier of fact, as Wolfson and his alleged privy did not have their day in court through an unopposed motion for summary judgment and none of the exceptions to collateral estoppel identified in *Baals* apply. The court believes "substantially participated in the preceding litigation" does not encompass an unopposed motion for summary judgment but rather something more, and the default was not entered as a result of the Wolfsons' bad faith. Accordingly, the exceptions to collateral estoppel do not apply here.

"The canvassing of New Jersey case law governing collateral estoppel reveals that the requirement that a matter be "actually litigated" means just that: the party against whom the doctrine is sought to be applied must have had a full and fair opportunity to litigate the issue to be precluded, so that a judgment on the merits, reached after an adversarial hearing, is entered." *Azeglio*, 422 B.R. at 497.[4]  Indeed, Laurie Wolfson did participate in the state court litigation before allowing the Summary Judgment Motion to go unopposed, but this court has previously held that failure to appear after notice of a hearing does not render an issue "actually litigated." *See In re Fisher*, No. 16-12991-ABA, 2017 WL 590306, at \*7 (Bankr. D.N.J. Jan. 24, 2017) (finding the matter was not "actually litigated" where a judgment was entered after an evidentiary arbitration hearing in which debtor failed to appear). What is more, "[o]ften times this Court will conduct a proof hearing or consider evidence without the participation of a litigant to find the truth and to ensure a fundamentally fair result. But it does not mean that the matter was actually litigated for the purposes of collateral estoppel. Collateral estoppel applies where a 'judgment on the merits' is entered 'in an adversarial context.'" *In re Cortuk*, 633 B.R. 236, 282–83 (Bankr. D.N.J. 2021) (quoting *Slowinski v. Valley National Bank*, 264 N.J. Super 172, 182-83, 624 A.2d 85, (App. Div. 1993)). Since the State Court Judgment was entered after an unopposed motion for summary judgment, the court finds that the matter was not actually litigated and does not find that Wolfson substantially participated in the process leading up to the State Court Judgment and, consequently, collateral estoppel will not preclude Wolfson from defending the fraud claims before this court.

## 2.  1st Colonial's Claim under 11 U.S.C. § 523(a)(2)(B)

In support of its argument under section 523(a)(2)(B), 1st Colonial pleads use of a false statement in writing with intent to deceive based upon applications in connection with a loan which statements related to Wolfson's prior foreclosures and his status as a guarantor on other obligations. Doc. 54, p. 2.

11 U.S.C. § 523(a)(2)(B) of the United States Bankruptcy Code provides:

---

[4] As noted by 1st Colonial in the 1st Colonial Brief, p. 55, even *res judicata* requires a judgment in the prior matter to on the merits. *Rodrigues v. Unifund CCR, LLC*, 690 F. App'x 799, 802 (3d Cir. 2017).

(B) use of a statement in writing—
    (i) that is materially false;
    (ii) respecting the debtor's or an insider's financial condition;
    (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
    (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). As noted above, 1st Colonial must satisfy each element of the statute in order for it to prevail on its claim of nondischargeability against Wolfson. As it was one of the concerns the court addressed at the time of 1st Colonial's motion of summary judgment, the court starts with the reliance element set forth under section 523(a)(2)(B)(iii).

To satisfy section 523(a)(2)(B)(iii), 1st Colonial must prove that it both: *actually* relied on the Wolfsons' statements; and that reliance was reasonable. *Cohn*, 54 F.3d at 1114-15. "The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." *Id.* at 1117 (citations omitted). This is a factual analysis, and the Third Circuit further explained:

> A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Id*.; *In re Russo*, No. 15-24843 (SLM), 2019 WL 117469, at *28 (Bankr. D.N.J. Jan. 4, 2019); *In re August*, 448 B.R. 331, 351 (Bankr. E.D. Pa. 2011). "[T]he determination of reasonable reliance by a lender under § 523(a)(2)(B) is factual in nature and insulated by the clearly erroneous standard of review." *Cohn*, 54 F.3d at 1118.

Here, 1st Colonial alleged that Wolfson knowingly made false representations and withheld material information during the loan application process, specifically, misrepresenting a prior foreclosure on Wolfson's property and his status as a guarantor on other obligations. 1st Colonial argues these actions were intended to deceive the Plaintiff and led to the loan being granted under false pretenses.

1st Colonial called Wolfson as its first witness. During 1st Colonial's direct examination, the court found Wolfson credible. The facts revealed at trial establish that Wolfson is a

sophisticated debtor with knowledge and experience in real estate lending, credit reporting, and construction. Trial Tr. 1, 16:17–19:2. In 2016, Wolfson bought the Property in cash. Trial Tr. 1, 19:3-9. Then, the Wolfsons sought financing through different sources for a construction loan for developing the Property. Ultimately, in 2018, 1st Colonial made a loan to the Wolfsons initially in the amount of $1.6 million (the "Loan").

Wolfson's direct testimony further established that prior to their relationship with 1st Colonial, in 2017 through early 2018, Wolfson engaged in loan negotiations with Fulton Bank ("Fulton") to fund the construction of a house, barn/stables, and pool on the Property along with landscaping and other preparation work (the "Project"). Trial Tr. 1, 19:15-25 and 29:12-30:15. In connection therewith, 1st Colonial introduced evidence that in May 2017 Wolfson emailed a Fulton loan officer and advised that his credit issues and foreclosure stemmed from the financial crisis of 2008. Trial Tr. 1, 98:20-101:9 and 1st Colonial Ex. 5. In response, Fulton issued a loan denial on June 15, 2017, due to "foreclosure or repossession in credit history" and "delinquent credit obligations." On September 28, 2017, Wolfson again emailed the Fulton loan officer to explain the credit issues, particularly the arrears on their residential mortgage, by advising her that the lender would not give him a loan modification, but he had the funds to pay off the arrears in May 2016. He indicated "the home was not foreclosed upon. It was in the foreclosure process, so by paying the arrearages, the loan immediately became current and has been paid on time since May of 2016." Trial Tr. 1, 98:11-16 and, 102:18-103:24, and 1st Colonial Ex. 11.[5] Wolfson further testified that he understood that if he waited for a few months the time window for Fulton to consider these obligations would be closed. So, he waited to reapply. Then, the Wolfsons reapplied to Fulton and initially, that application was denied due to a low appraisal for the Property. However, a new appraisal was ordered by Fulton, and ultimately, consistent with his understanding, terms for a loan commitment from Fulton was provided to the Wolfsons. Trial Tr. 1, 22:17-23:25 and 1st Colonial Ex. 19. This appears to confirm Wolfson's understanding about the treatment of the foreclosure issue. No testimony was provided to refute this understanding.

Nevertheless, prior to obtaining the commitment from Fulton, someone recommended that Wolfson connect with Jerry Silvi ("Silvi") a senior credit officer and Executive Vice-President of 1st Colonial.[6] Trial Tr. 1, 24:3-23 and 147:12-13. Silvi was the only witness that 1st Colonial produced with direct knowledge of 1st Colonial's relationship with the Wolfsons. No other witnesses from 1st Colonial itself were produced. Thus, it is Silvi's testimony that establishes 1st Colonial's procedures as they related to the Loan.

The testimony revealed that Wolfson connected with Silvi and on April 9, 2018, they met to discuss a loan. Trial Tr. 1, 24:13-25:16. This apparently was the first time the parties developed

---

[5] Wolfson, remained consistent in his belief that "[t]he home was not foreclosed upon. It was in the foreclosure process, so by paying the arrearages, the loan immediately became current and has been paid on time since May of 2016." *e.g.* Trial Tr. 1, 103:21-24. The court finds Wolfson credible in his belief that his home was not "foreclosed upon" under these circumstances As an aside, while Wolfson's misunderstanding of the foreclosure process is unfortunate, in this court's experience, his belief that he was "not foreclosed upon" is not inconsistent with the multitude of debtors who have filed for bankruptcy protection after a foreclosure judgment has been entered and even when a sheriff's sale has occurred because they remain in their home and try address their arrears through bankruptcy.

[6] Now, a former employee of 1st Colonial.

their relationship. The expectation was that the Wolfsons would supply Silvi with a list of documents related to the Project. Trial Tr. 1, 26:24-27:10 and 1st Colonial Ex.16. On that same day, Wolfson did supply Silvi with the financial statements that Fulton created from inputs from the Wolfsons and while providing the information, Wolfson acknowledged that and advised Silvi that the information was not entirely accurate and needed updating. Trial Tr. 1, 30:15-22; 35:16-37:13 and 1st Colonial Ex.18. The next day, Wolfson provided Silvi with Fulton's terms for its commitment for a loan. Trial Tr. 1, 37:18-25 and 1st Colonial, Exs. 19 and 20. There is no evidence that 1st Colonial sought any other information directly from the Wolfsons. Within two days of that, on April 12, 2018, Silvi provided the Wolfsons with a mortgage commitment. Trial Tr. 1, 46:6-18. and 1st Colonial Ex. 23. Ultimately, the Wolfsons decided to pursue the mortgage commitment from 1st Colonial instead of Fulton. The court finds Wolfson credible in his testimony regarding his reasons for choosing 1st Colonial over Fulton including the fast approval of the financing. *See, inter alia*, Trial Tr. 1, 41:6-42:16 and 1st Colonial Ex. 25.

In connection with the loan approval, an initial loan application was created (the "Initial Application") also on April 12, 2018. 1st Colonial Ex. 22. While Wolfson admits that he and his wife ultimately signed the Initial Application, they did so without reviewing it carefully, Trial Tr. 2, 66:15-20, and he disputes that they were interviewed about or provided the information and/or created or filled out the Initial Application and submitted it to 1st Colonial. Instead. The Wolfsons contend that Silvi or someone at 1st Colonial prepared the Initial Application with information populated from outside sources like a credit report. Trial Tr. 1, 44:8-45:19; 48:19-49:10; Trial. Tr. 2, 60:18-20 and 126:1-10. Indeed, Silvi confirmed that 1st Colonial actually prepared the Initial Application, and some information was auto populated. Trial Tr. 1, 176:14- 177:11. No evidence of an *actual* interview with the Wolfsons was produced by 1st Colonial — although Silvi eventually did have a change of heart and ultimately said he conducted an interview (that change of heart is discussed further, below).

Silvi testified that the Initial Application was taken over the phone, but he did not have any specific recollection of that interview, whether he even conducted it, or if he participated in the preparation of the Loan application. Trial Tr. 1, 151:23-152:3; 177:12-178:21. Incredibly, while Silvi testified that he had no recollection of *any* of the Wolfsons' loan application process, he was able to specifically recall and affirmatively state that Wolfson never told him anything about a foreclosure and that their residence had been scheduled for a sheriff's sale. Trial Tr. 1, 152:8-19. So strange that is the *one thing* he remembers.

Then, on redirect, Silvi refreshed his recollection and stated that he fully participated in the Initial Application process. *But,* he stated that his renewed understanding of what he *would have asked* the Wolfsons would have come from what he claims to be *what would have ordinarily been done* when completing applications at that time.[7] Trial Tr. 1, 178:18-21 and 196:19-197:12. Still,

---

[7] While Silvi subsequently testified on redirect after reference to an earlier deposition related to state court litigation between 1st Colonial and the Wolfsons that it would have been part of his application via telephone process to ask the questions set forth on the loan application, neither his refreshed memory nor his elicited testimony convinces the court that he actually conducted a telephone interview with the Wolfsons. What is more, the court struggles to find that Silvi *actually* fully participated in the approval of the Loan process here and based upon his testimony about scrubbing loans, the court does not find it credible that he did. As to Silvi's change in testimony, the court is also skeptical and notes that there may have been a different motivation for the testimony referred to in connection with the state court litigation.

Silvi also could not recall any specifics about the Initial Application process, Trial Tr. 1, 177:12-14, or whether the Wolfsons advised him about any prior foreclosures or foreclosure judgments. Trial Tr. 1, 152:12-19. Wolfson sent an email to Silvi attaching an Experian credit report intending to explain an incident of consequence which was a foreclosure. The email states:

> Jerry here is the Experian credit report pulled yesterday. You will notice one credit incident of any consequence two years ago. Please feel free to discuss with me if you like.

1st Colonial Ex. 49 and Trial Tr. 1, 87:24-88:14. While Silvi did not recall the email from Wolfson, he did not deny that he received it nor could he recall why it was sent. Nonetheless, it apparently would have been ignored as he indicated that 1st Colonial would not have considered a borrower provided credit report. Trial Tr. 1, 157:2-16. Astonishingly, Silvi denied that it was his signature as Loan Originator on the Initial Application despite his alleged significant role in the Initial Application process and his name being clearly printed under the signature line. Trial Tr. 1, 177:17-178:2 and 1st Colonial Ex. 22.

We learned further from the testimony of Silvi, that he was a college graduate with experience in credit trained banking for mortgage and commercial banking for probably 30 years. Trial Tr. 1, 146:13-16. Prior to his employment at 1st Colonial, he had his own mortgage banking operation. Trial Tr. 1, 147:1-5. He became employed at 1st Colonial in 2008. Trial Tr. 1, 146:24-25. At 1st Colonial, Silvi started as a senior Vice President mortgage and lending and then eventually advanced into consumer lending, then gradually commercial lending. When he left 1st Colonial, he was Executive Vice President senior credit officer for the Bank who oversaw the three units of commercial, residential, and consumer lending. Trial Tr. 1, 147:9-15.

When Silvi became a credit officer, he was given a million-dollar approval with a second signature. The court understood Silvi's testimony to mean that the president of 1st Colonial was the second signature required. Nevertheless, anything above the million-dollar threshold required the approval of a loan committee. Trial Tr. 1, 147:16-148:4.

Silvi served several roles at 1st Colonial. Relevant here were his roles as a producing manager for loan originations and chairman of the loan committee. These roles required him to participate in the loan application process and be familiar with the credit policies of 1st Colonial. As such, Silvi was able to describe the various processes for handling a loan application. He testified that an application could be done by phone. Trial Tr. 1, 148:12-149:17. If an application was taken by phone, he explained that:

> We would go through the application, all the details, all the questions, yes or no. And then within two or three business days we'd have to disclose that information back to the borrower to validate it and they would initial that application and send it back as part of their initial disclosures.

Trial Tr. 1, 149:18-25.

Silvi next explained that all loans had to be checked for accuracy and "that's what the underwriting people do."  Trial Tr. 1, 179:7-10. Silvi described the process as:

> A So the process would be after the borrower signs the disclosures and the application and submits enough financial information to start a credit process, that's how the process, then it would go to the underwriter. We have multiple ones. And they would look at it and match up tax returns, income, assets, real estate.
>
> Q And so it's your expectation that underwriting would catch any error that was on a loan application, isn't that correct?
>
> A So there's – yes. There's a couple backstops. We have quality control, we had internal audit. We had external audit. So we have multiple eyes looking at loans.
>
> Q And your underwriting people check Lexis, they checked credit reports and title reports, correct?
>
> A *Traditionally that's part of it, yes.*
>
> *Q So 1st Colonial did not just rely on the information provided by the Wolfsons in this application to approve a loan, did they?*
>
> *A They rely on what's the credit risk, the income, the assets, the ability to repay. So yes, there's multiple facets.*
>
> *Q Okay. So it's not just what the Wolfsons provided, it's their own review, their own verification of the information is also what they relied on, correct?*
>
> *A Yes, does it qualify and does it meet the credit policy.*
>
> Q And in fact at 1st Colonial at the time there would be at least three or four sets of eyes on any loan application, right?
>
> A Well the originator and then it would go to, yeah, post close, yup, quality control - - yeah, at least four sets.
>
> Q And in your words a loan this size has to get scrubbed, correct?
>
> A Yes, it did, yes, it does.

Trial Tr. 1, 179:14-180:21 (emphasis added). Later in his testimony, Silvi confirmed several times that through its system of checks and balances, *inter alia*, a LexisNexis report would bring up a foreclosure separately through both a person's name and address for 1st Colonial.  Trial Tr. 1,

198:5-10 and 202:21-204:2. A LexisNexis report on the Wolfsons on behalf of 1st Colonial was not brought to the court's attention.

Silvi acknowledged that it was not unusual for initial loan applications to have mistakes and in fact, there were some errors in the Initial Application. Trial Tr. 1, 180:22-181:9. He explained that the normal practice was that *he would review* the final loan application before it was signed with a borrower at the closing on the loan. Trial Tr. 1, 181:6-13. Silvi also confirmed that substantive mistakes on a final loan application could not be changed at closing. Trial Tr. 1, 181:25-183:10. It is undisputed that it was 1st Colonial, not the Wolfsons, which prepared the loan documents on which it relies. *See e.g.*, Trial Tr. 1, 44:2-16 and 177:1-6.

Despite it being the "normal practice", Silvi did not attend the closing on the Loan. Nor did he review the final loan application dated May 7, 2018, with the Wolfsons. 1st Colonial Ex. 27, (the "Final Application", together with the Initial Application, the "Applications"). Instead, it was 1st Colonial's counsel who appeared at closing. Silvi has no idea whether the Final Application was reviewed with the Wolfsons. Trial Tr. 1, 181:10-24. Wolfson says that it was not and that 1st Colonial's counsel simply handed the documents to the Wolfsons to sign. Counsel did not explain any of the terms of any of the documents to the Wolfsons. Trial Tr. 2, 69:10-70:7. The Wolfsons signed the Final Application without reviewing it, just as they did the other documents presented to them such as the Note and Mortgage secured by the Property. Trial Tr. 2, 70:12-19. The court accepts this version of the facts as 1st Colonial did not produce any witnesses to contradict the foregoing.

What is abundantly clear from Silvi's testimony is that with a loan the size of the Loan, he was responsible for connecting with the prospective applicant, obtaining the initial application information but after that, at least four sets of other eyes vetted the application using outside resources in addition to the information provided for by the applicant — keeping in mind that 1st Colonial would not have considered a borrower provided credit report and would not rely just on what the borrower provided — and that he alone, could not make the final decision. A committee had to examine and authorize the loan and, someone else had to act as an additional signatory authorizing the loan.

In 1st Colonial's initial post-trial brief, it is noted that the Initial Application contains information about the Wolfsons' assets, liabilities, income and financial history. At issue in 1st Colonial's cause of action is that the Initial Application provides as follows:

> • That Wolfsons owned property at 248 Merion Ave., 268 Merion Ave., and Brigantine, NJ. At the time Wolfson applied for the Loan, the Wolfsons resided at 268 Merion Ave, Haddonfield, New Jersey. *See* Doc. No. 52, p. 12, ¶ 32.

> • That 248 Merion Ave was not subject to any mortgages.

> • That Wolfsons were not subject to any foreclosures within the last seven (7) years.

  • That Wolfsons have never been directly or indirectly obligated on any
  loans that resulted in foreclosure.

  • That neither of the Wolfsons was a co-maker or endorser on a note.

*See* Doc. No. 52, p. 15, ¶ 53.

Silvi testified that he *thought* the credit policy at the time of the Wolfson's loan origination was that if there was a bankruptcy or foreclosure 1st Colonial would not be providing financing. Trial Tr. 1, 154:13-155:5. Silvi indicated that a foreclosure filing might show on an individual's credit but he does not know if a credit report was pulled on Mr. Wolfson as it was usually someone else's responsibility to do so.  Trial Tr. 1, 155:6-23. At the same time however, Silvi did not provide any testimony as to the significance to 1st Colonial of the information about the 248 Merion Ave. property and that neither of the Wolfsons were a guarantor, co-maker or endorser on a note.

Eventually, Silvi confirmed that 1st Colonial did pull a credit report on the Wolfsons, Trial Tr. 1, 156:15-23 and 1st Colonial Ex. 48, and it, in addition to the Experian credit report provided by Wolfson to him, Trial Tr. 1,  157:5-20 and 1st Colonial Ex. 49 (something, Silvi testified, that 1st Colonial would not look at), both reported the "public records" section (a place where a foreclosure judgment would show up, *id.* at 156:15-20) as "zero." What is more, the public judgment search of judgments against the Wolfsons on 1st Colonial's own title search[8] did not show any foreclosure judgments, despite showing a judgment in favor of American Express on a book account from 2011. Trial Tr. 1, 156:1- 158:20 and 1st Colonial Ex. 68.[9] The court finds this baffling especially since 1st Colonial introduced a foreclosure judgment against Wolfson at trial. Trial Tr. 1, 94:14-18 and 1st Colonial Ex.8.

As stated above, 1st Colonial needs to prove each factor under section 523(a)(2)(B) to meet its burden, and the court finds that based upon the testimony of its only witness and the evidence produced, it has not been established that it reasonably relied on the representations by the Wolfsons. To be sure, the court is not convinced 1st Colonial *actually* relied on any statements from the Wolfsons in connection with the Loan. 1st Colonial's only witness to explain its loan application and approval process, Silvi, confirmed that 1st Colonial did not just rely on the information provided by the Wolfsons in the Application and would have ignored other information provided by the Wolfsons.[10] Instead, Silvi made it clear that 1st Colonial had a system

---

[8] The address provided for on the title report was the Property — not the Wolfsons' other addresses listed in the Applications.

[9] The Wolfsons did not prepare 1st Colonial Exhibits 48 and 68 (Trial Tr. 1, 109:11 "[To Mr. Wolfson] I'm not suggesting that you have seen this before . . ." and 110:23-24) and there is no evidence on the record that the Wolfsons reviewed those documents or made representations about the information contained therein prior to signing the Applications or any time thereafter prior to the trial now.

[10] At one point in response to direct questions from counsel, Silvi stated 1st Colonial relies upon loan applications submitted by borrowers and relied upon the loan applications signed by the Wolfsons. Trial. Tr. 1, 160:5-11. The court does not find this testimony credible as Silvi did not demonstrate he has personal knowledge of what was actually relied on by the loan committee in approving the Loan (loan committee consideration and approval was required since this loan exceeded his million-dollar threshold) and it is inconsistent with his testimony about the loan process.

of checks and balances — with multiple-eyes on the Loan to assess the credit risk, the income, the assets, the ability to repay, and other multiple facets after its *own* review and verification of the information necessary to meet its credit policy. Of course, it was not unusual to have mistakes or errors in the application process but 1st Colonial's backstops were in place to catch them. Trial Tr. 1, 179:7-181:8. Indeed, those backstops clearly identified a judgment in favor of American Express. 1st Colonial Ex. 68. Yet, the Final Application *prepared by 1st Colonial* checked off a box that stated there was no outstanding judgments! 1st Colonial Ex. 27, p. 5.

Notwithstanding all that, 1st Colonial claims to have actually relied on the information provided by the Wolfsons in the Applications, which neither the Wolfsons nor Silvi prepared, Silvi was not present when the Wolfsons signed the Final Application, and more incredibly, Silvi disputes he signed the Initial Application, in making the Loan. But, 1st Colonial could not have relied on the Wolfsons in connection with the checked off boxes because it prepared those boxes and it had to know that the information was wrong on its face based upon its own thorough research and reports showing a judgment in favor of American Express. As well, there was no testimony submitted to the court demonstrating that 1st Colonial actually relied on information specifically provided by the Wolfsons and the court does not find Silvi persuasive or credible in this regard. Trial Tr. 1, 160:4-11. Indeed, such a position would be inconsistent with Silvi's testimony that to do so would simply not be 1st Colonial's process. Since this loan was above Silvi's million-dollar threshold, it needed another signatory and loan committee approval. What evidence has been submitted that demonstrates which statement in writing that 1st Colonial actually relied on? Sure, we have Silvi's speculation of what he might have relied on at that time, but where was the evidence from anyone involved in the approval process showing what 1st Colonial relied on a statement in writing *from the Wolfsons*? It surely cannot be just checked off boxes that were filled in by 1st Colonial based upon information it had in its possession which was incorrect on its face.

In the end, the court in assessing Silvi at trial, found him to be inconsistent in his testimony and not credible at times. The court is not convinced that Silvi had personal knowledge of what 1st Colonial actually relied on here and for sure he did not testify to how 1st Colonial relied on any of the information about the 248 Merion Ave. property and the Wolfsons' guarantor, co-maker or endorser status that forms part of the basis for its claim. *But*, Silvi was sure of one thing, 1st Colonial's reliance was *not* limited to just what the Wolfsons provided.

What is more, neither the Loan "scrubbers", nor an underwriter, nor a member of the loan committee, nor the other signatory on the Loan, nor any other representative from 1st Colonial supported or contradicted Silvi's testimony or provided evidence of actual reliance on a statement in writing provided by the Wolfsons. It has not been established that anyone at 1st Colonial making the decision to extend the Loan even relied on the information provided by the Wolfsons at all and to be sure, the court does not take Silvi's word for it. Any reliance on a checked off box about judgments fails because the Loan applications themselves contained a known glaring error; but 1st Colonial ignored the error and still granted the Loan. Where is the reliance then?

With all of this, the court cannot fathom how 1st Colonial's thorough multiple eyed system of checks and balances and a known error could possibly allow for it to claim it *actually* relied on any statement in writing or other information provided by, or not provided by, the Wolfsons to

satisfy section 523(a)(2)(B)(iii). Only 1st Colonial can establish what *it* relied on, and 1st Colonial has failed to persuade the court. It did not meet its burden in this regard.

By the same token, if the court is mistaken and there was some kind of actual reliance by 1st Colonial, the court cannot find that its reliance was reasonable. As noted above, this requires a factual analysis, *Cohn*, 54 F.3d at 1117, and the facts presented at trial do not establish this element.

Now the court considers the first *Cohn* factor necessary for the finding of reasonable reliance: 1st Colonial's standard practices in evaluating creditworthiness. *Id*. Silvi confirmed that 1st Colonial's standard practices in evaluating loan applications, did not just rely on the information provided by borrowers, 1st Colonial examined the credit risk, the income, the assets, the ability to repay.1st Colonial considered multiple facets using its own multi-eyed review and verification of that information to make credit decisions. Importantly, Silvi added that the information on the Applications comes from the borrowers, but *it is 1st Colonial's job to validate it*. Trial Tr. 1, 178:3-17. Here, 1st Colonial prepared the Applications which contained mistakes. Along with that, one standard practice of 1st Colonial in its validation process was to conduct a LexisNexis search. Silvi confirmed that such a report would bring up a foreclosure through both a person's name and address. Trial Tr. 1, 198:5-10 and 202:24-204:2. Without question, such a report would have provided the information that 1st Colonial claims the Wolfsons deprived it of. But no such report was produced, leaving the court to conclude that none was conducted — contrary to its standard business practices.

Additionally, the record is devoid of any testimony from someone *with personal knowledge* of what information from the Wolfsons that 1st Colonial actually relied on in it its standard practice of processing the Loan. At best, Silvi's testimony was inconsistent, if not speculative, in this regard as the court is not convinced Silvi was part of the actual vetting process. Definitely *no* testimony from 1st Colonial was provided at all about the significance to 1st Colonial about the 248 Merion Ave. property and the Wolfsons' guarantor, co-maker or endorser status. Certainly, reliance simply on a checked off box on an application, with the multi-faceted systems of checks that 1st Colonial had in place, would be inconsistent with its standard practices of thorough vetting especially where the form it prepared contained misinformation based upon its own research. 1st Colonial also ignored Wolfson's attempt to explain matters of consequence (*see* 1st Colonial Ex. 49 and discussion below). It was also standard practice for Silvi to attend the closing of a loan. Silvi did not and there is no evidence that the Final Application was reviewed with the Wolfsons. Finally, Silvi testified, without challenge, that it was not his signature on the Initial Application! How can the court find that 1st Colonial was following proper standard practices when the identified Loan Originator has testified that he did not sign the document upon which 1st Colonial relies? Because of all of these defects, the court is hard-pressed to find that 1st Colonial followed its normal business practices here. When considering this, the court finds that 1st Colonial's reliance was not reasonable.

The second factor to be considered is the standards or customs of the creditor's industry in evaluating credit-worthiness, i.e., what is considered a commercially reasonable investigation of the information supplied by a debtor. *Cohn*, at 1117. 1st Colonial has the burden to establish that standard. Relying solely on Silvi's testimony, 1st Colonial did not produce any other witness to define industry standard. So, the court can only look to Silvi, with over 30 years of experience, to

understand the industry standard. Silvi convinced the court that loans like the Loan here, require the loan originator to sign applications. Loans require thorough vetting with multiple eyes on it to scrub the loan. Lenders do not just rely on what a borrower provides. Usually, a Nexis/Lexis report is obtained. A representative of the lender appears at the closing to review the documents.

To that end, as demonstrated above, 1st Colonial could not have followed industry standard because it failed to follow normal procedures for the Loan. The evidence shows that (1) the loan originator did not sign the Initial Application; (2) 1st Colonial did not obtain a LexisNexis report; (3) it alleges that it relied on a checked off box on a form it prepared that contained an error 1st Colonial was aware of through its own investigation; (4) it would not speak to Wolfson about his information; and (5) the Final Application or Loan documents were not reviewed with the Wolfsons. Because 1st Colonial strayed from industry norms in connection with the Loan, the court cannot find that 1st Colonial followed the standards or customs of its industry. When considering this, the court finds that 1st Colonial's reliance was not reasonable.

Finally, the last factor for the court to consider is the surrounding circumstances existing at the time of the Wolfsons' application for credit. *Id*. Consideration of potential red flags, previous business dealings that gave rise to a relationship of trust and/or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations is required. *Id*.

As to red flags, "[t]he existence of a 'red flag' which would put a reasonable prudent person on notice that the information contained in the financial statement may not be accurate is a key factor in the reasonable reliance test." . . . A creditor cannot ignore red flags that suggest inaccuracies, and should undertake at least some minimal investigation as to the representations contained in a financial statement with red flags." *In re Strength*, 562 B.R. 799, 805 (Bankr. M.D. Ala. 2016) (citations omitted). Before the Loan closed, Wolfson brought some credit issues with his mortgages and foreclosures to Silvi's attention through his email of April 10, 2018. *See* 1st Colonial Ex. 49 and Trial Tr. 1, 87:24-90:1 and Trial Tr. 1, 157:5-16. The email states "[y]ou will notice one credit incident of any consequence two years ago. Please feel free to discuss with me if you like." 1st Colonial Ex. 49. This is an *obvious* red flag and the court finds Wolfson credible in his testimony. He had been open with Fulton, and the court has no reason to believe he would not be open with 1st Colonial. Also, there is no credible testimony or evidence to dispute that 1st Colonial was not made aware of the red flag and/or that Silvi did not receive the email. There was no proof provided evidencing that 1st Colonial investigated this red flag. If reviewed, a reasonably prudent 1st Colonial should have known that the information would have suggested that the Applications may not be accurate. If it spoke to Wolfson, 1st Colonial may have learned about the foreclosure problem. Another red flag was that the Application contained information 1st Colonial knew to be incorrect. It obviously knew that there was at least one judgment in favor of American Express, yet the form *it* prepared, checked off a box that said there was no judgments. When considering these obvious red flags, the court finds that 1st Colonial's reliance was not reasonable. 1st Colonial's failure to address these red flags is a key factor in determining whether 1st Colonial's reliance was reasonable. *Strength*, 562 B.R. at 805; *In re Turner*, 358 B.R. 422, 427 (Bankr. N.D. Okla. 2006) (on notice of a red flag a key factor in determining reasonable reliance). When considering this, the court finds that 1st Colonial's reliance was not reasonable.

As to the second consideration, there were no previous business dealings between 1st Colonial and the Wolfsons. For sure, a first-time lending event does not constitute previous business dealings that gave rise to a relationship of trust. Instead, something more is required. *See*, *In re McCracken*, 586 B.R. 247, 258 (Bankr. S.D. Tex. 2018); *In re McCarthy*, 421 B.R. 550, 563 (Bankr. D. Colo. 2009). Wolfson, after originally seeking a loan from Fulton, met with Silvi to discuss a loan and provided him with a list of financial statements, even acknowledging that the information was not entirely accurate and needed updating. This was their first financial dealing together and within only a *few short days* Silvi provided the Wolfsons with a mortgage commitment. There were simply no prior dealings between 1st Colonial and the Wolfsons that would give rise to a relationship of trust or even enough time between the first meeting and the Loan commitment to create a relationship contemplated when considering this element. When considering this, the court finds that 1st Colonial's reliance was not reasonable.

Another consideration when reviewing the surrounding circumstances at the time of the Applications is whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. *Cohn*, 54 F.3d at 1117. Silvi testified that not only did 1st Colonial have access to programs such as LexisNexis that would reveal the foreclosure information, but it was also "traditionally" its procedure to use them. Surely a simple search on one of these programs, something that is ordinarily done, would have revealed the inaccuracy of the Wolfsons' representation. Considering that Silvi was alerted to credit issues through Wolfson's email, 1st Colonial Ex. 49, it seems to the court that a minimal investigation as to the credit issue should have been done. No testimony was provided evidencing any investigation into Wolfson's email was provided. When considering this, together with the red flags presented above, the court finds that 1st Colonial's reliance was not reasonable.

A creditor has the burden of establishing by a preponderance of the evidence that an obligation is not dischargeable. *Grogan v. Garner,* 498 U.S. 279. The Third Circuit in *Cohn* instructs us that in order to satisfy section 523(a)(2)(B)(iii), a creditor must show that its reliance was *both* actual and reasonable judged by the objective standard. 54 F.3d at 1118. Strictly construing the statue and considering the evidence presented at trial and applicable case law concerning section 523(a)(2)(B)(iii), the court finds that 1st Colonial has failed to meet its burden with regard to this element. Its only witness, Silvi, was not persuasive and the court found him inconsistent and speculative at times. The court did not find him credible as to his personal knowledge of what information from the Wolfsons on which 1st Colonial actually relied. 1st Colonial produced no other witnesses or evidence to demonstrate that it actually relied on the information provided by the Wolfsons. In addition, for the same reasons, 1st Colonial failed in its burden to establish that it reasonably relied on the information provided by the Wolfsons. Instead, the testimony revealed that 1st Colonial did not follow its standard practices in evaluating creditworthiness or the purported standards or customs of its industry in evaluating creditworthiness. To boot, the record reveals that the surrounding circumstances existing at the time of the Wolfsons' Applications showed at least one "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, there was no existing previous business dealings that gave rise to a relationship of trust, and a minimal investigation, something that 1st Colonial would have ordinarily done, would have revealed the inaccuracy contained in the Applications. From the objective standard, 1st Colonial's claim of reasonable reliance fails.

Given the lack of persuasive evidence, 1st Colonial's failure to satisfy the *Cohn* three-factor test and support a finding of reasonable reliance is fatal to its claim under section 523(a)(2)(B). *In re Deweil*, No. 07-25825(DHS), 2009 WL 1750200, at *10 (Bankr. D.N.J. June 17, 2009).   And because "[a] creditor alleging the nondischargeability of a debt under Code § 523(a) must prove by a preponderance of the evidence that *each element* has been met." *Spar*, 176 B.R. at 326 (emphasis added); *Kosinski*, 424 B.R. at 608. The court need not consider any of the remaining elements under that statute, Consequently, 1st Colonial's claim against Wolfson pursuant to 11 U.S.C. § 523(a)(2)(B) is DENIED and/or its objection to dischargeability of its claim under this statute is OVERRULED.

### 3.   1st Colonial's Claim under 11 U.S.C. § 523(a)(2)(A)

In support of its argument under section 523(a)(2)(A), 1st Colonial pleads false pretenses/actual fraud based upon his conduct in obtaining a $500,000.00 additional credit and loan extension on the Loan. Doc. No. 54, p. 2.

11 U.S.C. § 523(a)(2)(A) of the United States Bankruptcy Code provides:

> (a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> * * *
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). The necessary elements to establish a claim under section 523(a)(2)(A) claim are as follows:

> (1) the debtor obtained money, property or services through a material misrepresentation;
> (2) the debtor, at the time, knew the representation was false or made with gross recklessness as to its truth;
> (3) the debtor intended to deceive the creditor;
> (4) the creditor [justifiably] relied on the debtor's false representations; and
> (5) the creditor sustained a loss and damages as a proximate result of the debtor's materially false representations.

*In re Kennedy*, 566 B.R. 690, 726 (Bankr. D.N.J. 2017) (citing *In re Cohen*, 191 B.R. 599, 604 (D.N.J. 1996), *aff'd* 106 F.3d 52 (3rd Cir. 1997), *aff'd Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) and *Field v. Mans*, 516 U.S. 59, 72-75, 116 S.Ct. 437, 133

L.Ed.2d 351 (1995)). As with §523(a)(2)(B), the "[f]ailure to prove any one of the five elements *is fatal* to the creditor's nondischargeability case." *In re DeCastro*, No. 14-15597-ABA, 2015 WL 9777729, at *4 (Bankr. D.N.J. Nov. 25, 2015) (*citing In re Reynolds*, 221 B.R. 828, 834 (Bankr. N.D. Ala.1998)). Even if 1st Colonial could prove a false representation was made by Wolfson with an intent to deceive it at the time the representation was made, the court again struggles with whether 1st Colonial met its burden to establish the required reliance element under section 523(a)(2)(A) (a concern of the court initially raised at the time of 1st Colonial's motion of summary judgment). "Reliance remains a separate element that must be established by the creditor." *In re Homschek*, 216 B.R. 748, 754 (Bankr. M.D. Pa. 1998). "The determination of justifiable reliance is a question of fact subject to the clearly erroneous standard of review." *In re Bowen*, 198 B.R. 551, 555 (B.A.P. 9th Cir. 1996) (*citing In re Kirsh,* 973 F.2d 1454, 1456 (9th Cir.1992)).

To prevail on its claim, also like section 523(a)(2)(B), 1st Colonial must establish that it *actually relied* on Wolfson's alleged misrepresentation *at the time it was made* and that reliance *was justified. Field*, 516 U.S. at 74–75. *See also In re Givens*, 634 B.R. 755, 769 (Bankr. E.D. Tenn. 2021); *In re Copeland*, 291 B.R. 740, 767 (Bankr. E.D. Tenn. 2003). And while justifiable reliance is a less demanding standard than reasonable reliance and a creditor is not required to make an investigation into every representation made by a debtor, it is "not without some limits." *Field*, 516 U.S. 59, 71–72. In ascertaining its meaning, the Supreme Court noted that:

> [i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or *he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.*

*Id.* (citing W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)) (other citations omitted) (emphasis added). In this regard, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field*, 516 U.S. at 71. The Supreme Court further noted

> a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation….

*Id*. (quoting Comment § 541 Restatement (Second) of Torts (1976)). Accordingly, "[a] plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods." *In re Tomlinson*, No. 96 A 1539, 1999 WL 294879, at *12 (Bankr. N.D. Ill. May 10, 1999). *See also In re Jairath*, 259 B.R. 308, 315 (Bankr. N.D. Ill. 2001). And, "a plaintiff cannot ignore obvious "red flags," or "warning signs," that the specific representation is false or that specific material information has been omitted." *In re Urbealis*, No. 13-33201 (CMG), 2017 WL 3311214, at *10 (Bankr. D.N.J. Apr. 24, 2017) (other citations omitted). "Where a creditor 'ignores 'red flags' and fails to investigate warning signs that should arouse suspicion, reliance on the ... alleged implicit misrepresentation is unjustifiable.'" *In re Straughter*, 219 B.R. 672, 675 (Bankr. E.D. Pa. 1998) (citing *In re Frye*, Adv. No. 97-2303, 1998 Bankr. LEXIS 507 at *5 (Bankr. W.D. Pa. Apr. 3,

1998) and *In re Feld*, 203 B.R. 360, 371 (Bankr. E.D. Pa. 1996)). *See also In re Casper*, 466 B.R. 786, 794 (Bankr. M.D. N.C. 2012) ("Thus, a plaintiff who disregards 'red flags' will not be able to satisfy the justifiable reliance standard." (citing *In re Giovanni,* 324 B.R. 586, 594 (E.D. Va. 2005)) (citing *In re Anastas,* 94 F.3d 1280, 1286 (9th Cir.1996) as well as numerous other cases standing for the principal that red flags cannot be ignored).

## A. The Loan Modification

1st Colonial's claim under section 523(a)(2)(A) relates to an extension of the Loan sought and received by the Wolfsons to finish the Project. Under the Loan, the Project became over budget and Wolfson applied for a loan modification and extension in the amount of $500,000.00 (the "Modification"). Trial Tr. 1, 66:15-18; 72:24–73:13, Trial Tr. 2, 76:14-78:9. In connection with approving the Modification, Silvi emailed Wolfson on June 26, 2019, letting him know a new appraisal was needed as the previous two were from Fulton and they needed a new one, asking for a Form 1040 for 2017, extension for 2018,[11] and a current pay stub. 1st Colonial Ex. 54. Wolfson replied with a current pay stub from his then employer, Cortera. In addition, Wolfson also volunteered a 2018 W-2 from his job at TransUnion, admitting Silvi did not ask for the W-2, but was just sharing with him the total income and that he thought it would be useful. Trial Tr. 1, 72:14-23; 132:1-133:8; and 1st Colonial Ex. 54. The 2018 W-2 from TransUnion showed wages of $900,000.00, which included severance pay, and was also more money than Wolfson was making at his new job with Cortera. Trial Tr. 1, 133:22-134:12. Without question, the pay stub from Cortera indicates smaller compensation in addition to stating "Bustitle: Sr. VP Financial Services." 1st Colonial Ex. 54. Wolfson testified that he did not recall having a conversation with Silvi where he told him he did not work at TransUnion anymore and that he was now at Cortera. Trial Tr. 1, 134:14-23. Furthermore, Silvi claimed Wolfson never indicated to him that the earnings on the W-2 were from severance pay, and that he also did not recall Wolfson ever indicating that the earnings on the W-2 were from a job he no longer had. Trial Tr. 1, 169:9-18. Nonetheless, Wolfson explained that neither Silvi nor anyone from 1st Colonial ever asked why the pay stub submitted in the June 27th email was different from the others he submitted when the loan was initially approved, and he did not recall if he ever offered that information to Silvi or anyone from 1st Colonial. Trial Tr. 2, 84:2-9. And while counsel to 1st Colonial argued in her opening statement that since Wolfson was a contractor, his pay stubs would come from different places, Trial Tr. 1, 11:25 – 12:5, no credible evidence from anyone at 1st Colonial confirmed that suggestion or 1st Colonial's knowledge of it. And the court does not find such a position tenable considering Wolfson was identified with the title of Sr. Vice President of Financial Services on his Cotera paystub.

Nevertheless, Silvi forwarded the Cortera pay stub and TransUnion W-2 to the underwriting team, "because they would need his current income", and the loan went to the loan committee for approval. Trial Tr. 1, 170:16-24. The Modification was subsequently approved apparently in a rush and not immediately with the approval of the loan committee. Trial Tr. 1, 163:24-165:10. On the Uniform Underwriting and Transmittal Summary dated July 2019 ("Credit Increase Approval"), an underwriter comment noted "debt to income is 36, all within policy. Borrower has limited debts and has invested over 750,000 of his own funds. Exec at TransUnion with income that exceeds 900,000 annually…." Trial Tr. 1, 164:21-24 and 1st Colonial Ex. 33.

---

[11] Wolfson had previously indicated he was on a tax extension for 2018. Trial Tr. 1, 168:9-14.

Silvi confirmed the borrower's income is considered in the analysis for approving a loan and the notes on the Credit Increase Approval were based on the *assumption* that Wolfson held a position at TransUnion and earned $900,000.00. Trial Tr. 1, 165:11-17 and Trial. Tr. 1, 166:9-13.

At issue for 1st Colonial is that Wolfson had been laid off from his job at TransUnion and never revealed to 1st Colonial his change in employment and consequently his change in compensation. Doc. No. 54, p. 3. 1st Colonial argues that Wolfson has made omissions and implied misrepresentations to 1st Colonial because he:

- Concealed his job loss, which occurred shortly after the Loan closed, to 1st Colonial, which continued to make Advances to Debtor as requested for the Project;

- Concealed the reduction in income at his next job;

- Provided to the Bank, in connection with the First Loan Modification, a W-2 for the job he no longer had, which W-2 included severance pay – a W-2 that would, on its face, provide no indication whatsoever to 1st Colonial that Debtor's income had decreased or that he no longer worked for TransUnion; and

- During the funding period after the First Loan Modification, submitted budgets to 1st Colonial to request Draws while concealing the fact that he was using the money to pay personal expenses.

Doc. No. 52, p. 42 (collectively, the "Omissions"). 1st Colonial maintains that it is clear it relied on the submission of Wolfson's TransUnion W-2 as it listed in the Credit Increase Approval. The entirety of 1st Colonial's argument about justifiable reliance is:

* * * *

The Residential Lending Policy (which is applicable to the Loan, per Silvi's testimony at trial; *see* Trial Tr. 1, 185:13-15) requires 1st Colonial to determine that a borrower's housing payments and other obligations "do not constitute an undue strain on the borrower's ability to make all such payments promptly, and that a credit reputation is evidenced which would be commonly acceptable to private institutional mortgage investors." This includes consideration of the borrower's credit history. *See* Plaintiff's Exhibit 50. In approving the Loan initially, the Uniform Underwriting and Transmittal Summary dated April 13, 2018 ("Initial Loan Approval") noted that the Borrower "has strong reserves and limited debts, Exec at transunion with income that

exceeds $1.2m…[12] large bonus and commission." *See* Plaintiff's Exhibit 51. The Uniform Underwriting and Transmittal Summary dated July 2019 ("Credit Increase Approval") noted the new appraisal and also that Borrower "has limited debts and has invested over $750K of his own funds, Exec at transunion with inocme [sic] that exceeds $900K, annually". *See* Plaintiff's Exhibit 33. Clearly, 1st Colonial's underwriters looked at the Cortera Paystub and the TransUnion W-2 to come to that figure, and with no information from Debtor about the TransUnion job loss, they took him at his word. They had an appraisal, proof of income, and an unfinished property securing their interest-only loan. They had a budget and Draw requests that comported with the budget, not knowing that Debtor was siphoning loan proceeds to pay his mounting bills.

On paper, everything was fine. Borrowers were making their monthly interest-only payments, as Debtor pointed out in his testimony. As set forth above, Debtor is a sophisticated Debtor with a high income and a background in credit and construction. The Bank's reliance upon the curated information presented to it by Debtor was certainly justifiable.

Doc. No. 52, pp. 47-48 and Doc. No. 54 p. 10. However, 1st Colonial asks the court to assume several things here. Notably, the Residential Lending Policy, 1st Colonial Ex. 50, was never introduced, nor its terms ever discussed during the trial. And the only *very brief* testimony provided by Silvi about 1st Colonial's residential policy was that he believed Wolfson's Loan would fall under the residential category and he would have to read that policy to remember its terms. Trial Tr. 1, 185:13-186:18. Along with that, nowhere in Silvi's testimony did he say that *Wolfson* compiled, knew about or even reviewed the Initial Loan Approval or Credit Increase Approval. Trial Tr. 1, 162:9-163:19. Indeed, those documents are only initialed by representatives of 1st Colonial.

The testimony elicited at trial shows that 1st Colonial required/needed from Wolfson for purposes of approving the Modification: the Form 1040 for 2017; the extension for 2018 (which Silvi clarified was the tax extension and not Wolfson's W-2s for 2018); and a current paystub. 1st Colonial Ex. 54. Trial. Tr. 1, 167:23-168:20. There is nothing in the record concerning the Form 1040 for 2017. There is also nothing in the record about 1st Colonial ever receiving the extension for 2018. It is undisputed that Wolfson provided Silvi with his current paystub identifying him as a Sr. Vice President with Cortera. Wolfson also volunteered his 2018 W-2. With no questions asked, Silvi turned this information over to the underwriting team. The document related to the Modification, 1st Colonial Ex. 33, was prepared by someone other than Silvi, and the Modification was granted. There is no testimony as to what the underwriting team actually relied on. 1st Colonial asks the court to assume facts not in the record or could not be provided by its only witness.

---

[12] Interestingly, 1st Colonial omitted the language "only used average of $884,000 as" before "large bonus and commission". See Doc No. 51.

Nevertheless, Silvi's testimony confirmed that 1st Colonial required only three (3) specific things to grant the Modification. Wolfson actually gave it one of the three things needed: his current paystub identifying his new employer. No evidence was provided that Silvi or 1st Colonial received the other items. For example, Silvi stated that 1st Colonial needed Wolfson's tax extension for 2018. There is nothing in the record from 1st Colonial evidencing that it received that extension. Still, it granted the Modification. The court is lost on how 1st Colonial now claims that it relied on the 2018 W-2 when it was not even one of the documents it specifically requested/needed to make its determination about the Modification. Likewise, how can it claim it relied on Wolfson when its own underwriting team, which "scrubbed" the Loan, made a determination without a required/needed document and ignored the job change specifically detailed on the paystub it relied on? And there are no allegations that the paystub provided was false. And no follow up? Did 1st Colonial simply ignore its own lending policy when it did not obtain all the documents it required to approve the Modification or even compare Wolfson's uncontested current paystub to his past credit history (from the Loan) 1st Colonial surely had available to it?[13] Was its reliance on the information supplied by Wolfson actual or justifiable here? The court concludes it was not. The court does not find it plausible that a lending institution, with a relationship with a borrower whom it had just given a loan to, having a profound understanding of his employment and financials, would not be puzzled at seeing a different employer on a pay stub when reviewing a loan extension. Especially here, when the current paystub identified a different employer than on the volunteered 2018 W-2. Certainly, under the circumstances, facts were apparent to 1st Colonial, an experienced if not sophisticated lender, from a cursory glance that something was awry and it was required to make its own investigation. *Field*, 516 U.S. at 71. If not Silvi, 1st Colonial's underwriting team was required to use its senses. 1st Colonial cannot recover because it blindly relied upon alleged misrepresentations — the falsity of which would have be patent to it if it made a simple examination or investigation. *Id*. Accordingly, as 1st Colonial has not met its burden in proving it actually and justifiably relied on the representations by Wolfson in connection with the Loan Modification, 1st Colonial cannot succeed on its claim under §523(a)(2)(A).

## B. The Draws

1st Colonial also argues that during the funding period after the Modification, Wolfson submitted budgets to 1st Colonial to request draws ("Draws") while concealing the fact that he was using the money to pay personal expenses. 1st Colonial posits that Wolfson's claims that he

---

[13] *See In re Deweil*, No. 07-25825(DHS), 2009 WL 1750200, at *6 (Bankr. D.N.J. June 17, 2009) which suggests that a deviation from standard practices also prevents a claim of justifiable reliance. Like here *Deweil* involved a:

> Plaintiff [which] is a sophisticated lending firm with a multi-step application process to determine the creditworthiness of borrowers. … Clearly, the Plaintiff had the ability during the application process to collect all relevant information for its lending decision. In fact, it did a credit background check. The Plaintiff could have inquired as to whether the Defendant had outstanding tax liabilities by simply asking that question, especially if, as it now contends, it is an absolute factor in its decision process. Accordingly, any reliance that the Plaintiff placed on the Defendant's silence was not justifiable and any reliance as to the false financial statement is not actionable under Section 523(a)(2)(A)."

*Id*. at *6.

was allowed to use the money to "reimburse" himself falls flat, as a construction loan is made based upon budgets, and if the project is over budget, the borrower is responsible to make up the difference, not the lender. 1st Colonial argues that approximately $200,000.00 of 1st Colonial's funds were used by Wolfson to pay personal expenses as evidenced by its expert a trial.

As to the use of the loan proceeds, Wolfson argues the trial revealed they used all of those proceeds on the construction projection, and that Wolfson paid more into the project than he ever reimbursed himself from the loan proceeds.  Wolfson notes that 1st Colonial never objected to his practice of Draws during the time that construction was ongoing, approved every draw request funded, and had an outside vendor review the draw requests and inspect the progress of the construction before monies were advanced. Doc. No. 53, p. 22. He disputes 1st Colonial's expert's analysis that purported to show that Wolfson used the loan advances in ways not permitted under the loan documents.  Doc. No. 57, p. 2. Wolfson argues if he did use the loan advances in ways not permitted under the loan documents, it proves that the Wolfsons breached the contract between the parties, not that they committed fraud. *Id*. Lastly, Wolfson notes that fraudulent intent cannot be established by a purported expert, nor was such intent otherwise established by 1st Colonial. *Id.*

The burden with regard to satisfying the reliance element (or for that matter, any of the elements) under section 523(a)(2)(A) rested with 1st Colonial. The court again focuses on the reliance element and the entirety of the testimony from anyone from 1st Colonial concerning that element came from Silvi[14] where he stated:

> Q Okay. Just one final sort of area. You routinely reviewed the draw requests that Mr. Wolfson had submitted, correct?
> A So it would start with someone looking at what's in the budget and then what the request was. And it would usually be a processor or maybe even an underwriter. And they'd follow the schedule. *An inspector would go out, look at the property and check off what was completed, what percentages. And then we would call Mr. Wolfson and say here's the amount we're going to disburse.*
> Q All right. And do you recall ever having any concerns with any of the items that Mr. Wolfson or Mrs. Wolfson submitted for, in their draw requests?
> A As long as it was part of the budget.  . . .

Trial Tr. 1, 193:16-194:4 (emphasis added).  . . .

> . . . Did he ever tell you that he was going to use that money to pay for stuff for his wife's horse business or to pay his car payment or to pay on his American Express card or any other things other than the front wall entrance

---

[14] 1st Colonial's retained expert cannot have any personal knowledge of what 1st Colonial relied on at the time the Draws were made.

pillars, gate, gravel pave system and apron?
A No.
Q If you got a request for a draw with an email and a
budget, and the budget showed all the items that the draw was
going to pay, did he ever tell you he was going to use the
money for something else?
A No.

Trial Tr. 1, 198:23-199:8. . . .

Q Okay. [1st Colonial] asked you if Mr. Wolfson ever told
you that he was going to be using loan proceeds to pay
personal expenses and you said no, right?
A (No audible response).
Q But you would agree with me that if the loan proceeds
were reimbursing Mr. Wolfson for expenses that he had paid out
of his pocket that were budgeted for the property, that there
was nothing wrong with that, correct?
A If they were in the budget and he had, if they were in
the budget and it was part of the construction loan, I would
assume he's making the payments to whatever he's doing. But
he's already put out the money, he could be reimbursing
himself. I wouldn't know the answer.
Q And then he could use that money to pay other bills,
correct?
A I don't see why not, but I, you know. Most of the time
you put an invoice in and it gets paid, you get a check.
. . .
Q There was nothing wrong with Mr. Wolfson using money
obtained from bank draws to pay personal expenses if the Bank
draws were reimbursing him for money he had spent on the
project, correct?
A Correct.

Trial Tr. 1, 205:23-207-13. But where is 1st Colonial's evidence from someone at 1st Colonial[15] which supports the element of actual or justifiable reliance at the time the alleged misstatements were made? The court cannot assume an element on behalf of 1st Colonial. *In re Trexler*, No. 14-52495-WLH, 2016 WL 236054, at \*10 (Bankr. N.D. Ga. Jan. 11, 2016) ("When there is no evidence to explain what happened . . . the plaintiff fails to meet his burden.") (citing *In re Fravel*, 485 B.R. 1, 18 (Bankr. D. Mass.2013); *In re Ginsberg*, No. 08 B 30836, 2009 WL 4036559, at \*7 (Bankr. N.D. Ill. Nov. 20, 2009)("It is not enough, however, that [plaintiff] plead reliance. . . . It is not plausible for the court to conclude that [plaintiff's] reliance on [defendant's] statements could have been justifiable if no facts are alleged to support [plaintiff's] belief . . .).

---

[15] Indeed, the court even sustained 1st Colonial's objection to a question asked of Silvi about whether the bank knew something when he had no personal knowledge of the information sought. Trial Tr.1, 201:20-202:2.

On the testimony elicited the court is hard-pressed to find that 1st Colonial relied in anyway on an alleged misstatement from Wolfson as it pertains to the Draws when they were made. According to Silvi, the process was that an inspector would go out and look at the Property to confirm that work was done *before* it would disburse funds. Silvi also testified that it was not wrong for disbursed funds be used to reimburse personal expenses. To be sure, 1st Colonial had no policy preventing Wolfson from utilizing the Draws to reimburse himself for personal expenses. So how can 1st Colonial claim it relied on a misstatement by Wolfson when it was its own investigator who went out to inspect the Property, confirmed that the work was done enabling a disbursement to be made and only after the investigator reported back to 1st Colonial the results of its investigation, 1st Colonial disbursed funds. This happened for each of the Draws. The court cannot fathom how 1st Colonial relied on anything from Wolfson in connection with the Draws. It was 1st Colonial's own investigator who represented to it that the work was done and the Draws appropriate. It just does not make sense that if the disbursed funds were being improperly used and not for work on the Project, how could the investigator repeatedly sign off on the disbursement confirming that the work was done enabling the Draws to be made. Who did 1st Colonial really rely on here? It cannot be Wolfson as no funds could be disbursed without 1st Colonial getting a representation from its own investigator confirming that the work was done. Did 1st Colonial bury its head in the sand with regard to the Draws as it did before with Wolfson? And according to 1st Colonial through Silvi, it was not wrong to utilize funds for personal use after the Draws were disbursed. So, where is the reliance on an alleged misstatement made by Wolfson at the time it was made? Accordingly, as 1st Colonial has not met its burden in proving it actually and justifiably relied on the representations by Wolfson in connection with the Draws, 1st Colonial cannot succeed on its claim under section 523(a)(2)(A).

As all the elements under that section must be met for the moving party to prevail, no further discussion is required. Nevertheless, and purely academic at this point, truly, the court is at a loss as to even how fraud can be alleged with regard to the Draws. The court has serious doubts as to whether Wolfson intended to deceive 1st Colonial when submitting the Draws. *See Kennedy*, 566 B.R. 726 ("To prevail on a claim under [section 523(a)(2)(A)] a creditor must show…the debtor intended to deceive the creditor"). Section 523(a)(2)(A) requires "that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation." *In re Oakley*, 503 B.R. 407, 433 (Bankr. E.D. Pa. 2013), *aff'd,* 530 B.R. 251 (E.D. Pa. 2015) (quoting *In re Harrison,* 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003)). Wolfson made every payment on a timely basis until 1st Colonial called the loan. Trial Tr. 2, 85:24-86:13. The court also finds Wolfson credible in his testimony that he believed it didn't matter what the reimbursement money was used for, that it could have nothing to do with the Project. Trial Tr. 2, 111:9-21. Certainly, Silvi's testimony seems to confirm this understanding. Trial Tr. 1, 205:23-207-13. There has to be a deliberate scheme to defraud. *In re Altieri*, No. 11-12819 DHS, 2012 WL 3595298, at *4 (Bankr. D.N.J. Aug. 20, 2012). And "because direct proof of intent to defraud is rarely available, courts may infer the element of intent based on circumstantial evidence") (citing *In re Balzano*, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991); *Altieri*, WL 3595298, at *4 ("while intent may be inferred, 'it cannot be presumed"). The evidence from trial does not suggest a deliberate scheme to defraud when it comes to the Draws.

Based upon the lack of persuasive evidence and 1st Colonial's failure to satisfy a necessary element for a claim under section 523(a)(2)(A), 1st Colonial's claim against Wolfson with regard

to the Loan, Loan Modification, and Draws pursuant to 11 U.S.C. § 523(a)(2)(A) is DENIED and/or its objection to dischargeability of its claim under this statute is OVERRULED.

## **CONCLUSION**

For the foregoing reasons, 1st Colonial's claims against Wolfson under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B) are DISCHARGED. The Adversary Proceeding shall be terminated.

An appropriate Order has been signed simultaneously herewith.

Dated: March 31, 2026                    /s/ Andrew B. Altenburg, Jr.
                                         United States Bankruptcy Court
                                         for the District of New Jersey